[No. B050295. Second Dist., Div. Seven. Sept. 17, 1990.]

L. JEROME OZIEL, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
CBS INC., et al., Real Parties in Interest.

## COUNSEL

Bradley Wm. Brunon and Jeffrey J. Douglas for Petitioner.

No appearance for Respondent.

Herbert M. Schoenberg, Beth A. Finley, Munger, Tolles & Olson, Steven M. Perry and Michael R. Doyen for Real Parties in Interest.

## OPINION

**LILLIE, P. J.**—By petition for writ of mandate, L. Jerome Oziel seeks to set aside that portion of a May 22, 1990, order of respondent court granting disclosure of portions of videotapes of the execution of a search warrant for petitioner's residence and office. The issues raised by the petition are (1) whether the trial court abused its discretion in permitting public disclosure of videotapes containing images of the interior of petitioner's home obtained under color of a search warrant, and (2) whether the issue of the legality of the videotaping of the execution of the search warrant is properly before us.

### FACTUAL AND PROCEDURAL BACKGROUND

L. Jerome Oziel, a psychotherapist, is alleged to have provided treatment to Erik Galen Menendez and Joseph Lyle Menendez, defendants in underlying murder prosecutions, and allegedly possessed evidence relating to the murders. On March 9, 1990, a search warrant, silent on the issue of whether the officers were authorized to videotape its execution, was issued pursuant to Penal Code section 1524, subdivision (c),[1] to search Oziel's home and

---

[1]Penal Code section 1524 provides in pertinent part: "(a) A search warrant may be issued upon any of the following grounds: [¶] . . . (4) When the property or things to be seized consist of any item or constitutes any evidence which tends to show a felony has been committed, or tends to show that a particular person has committed a felony . . . . [¶] (b) The property or things described in subdivision (a) may be taken on the warrant from any place, or from any person in whose possession it may be. [¶] (c) Notwithstanding subdivision (a) or (b), no search warrant shall issue for any documentary evidence in the possession or under the control of any person, who is . . . a psychotherapist as defined in Section 1010 of the Evidence Code, . . . and who is not reasonably suspected of engaging or having engaged in criminal

office. During the execution of the search warrant by a special master, the exterior and interior of Oziel's home and office, including Oziel's wife in a bathrobe and various rooms and personal property inside the home, were videotaped.[2]

On May 16, 1990, National Broadcasting Company, Inc., and Capital Cities/ABC, Inc., each filed in superior court petitions for an order permitting disclosure of the search warrant videotapes as well as other items not at issue herein; CBS Inc. filed notice of joinder in the above petitions.[3] The

activity related to the documentary evidence for which a warrant is requested unless the following procedure has been complied with: [¶] (1) At the time of the issuance of the warrant the court shall appoint a special master in accordance with subdivision (d) to accompany the person who will serve the warrant. Upon service of the warrant, the special master shall inform the party served of the specific items being sought and that the party shall have the opportunity to provide the items requested. If the party, in the judgment of the special master, fails to provide the items requested, the special master shall conduct a search for the items in the areas indicated in the search warrant. [¶] (2) If the party who has been served states that an item or items should not be disclosed, they shall be sealed by the special master and taken to court for a hearing. [¶] At the hearing the party searched shall be entitled to raise any issues which may be raised pursuant to Section 1538.5 as well as a claim that the item or items are privileged, as provided by law . . . . [¶] (d) . . . Any information obtained by the special master shall be confidential and shall not be divulged except in direct response to inquiry by the court . . . . [¶] (e) Any search conducted pursuant to this section by a special master may be conducted in such a manner as to permit the party serving the warrant or his or her designee to accompany the special master as he or she conducts his search. However, that party or his or her designee shall not participate in the search nor shall he or she examine any of the items being searched by the special master except upon agreement of the party upon whom the warrant has been served."

[2] It is not clear from our record whether the special master made the videotape or whether it was made by a Beverly Hills police officer. Although the statute is silent on the authority of the special master to videotape his execution of the search warrant, the statute clearly provides that it is only the special master who is to conduct the search and who is to examine any of the items being searched, unless the party searched (Oziel) consents to such participation and examination by the accompanying police officer.

As explained in more detail in part IV of this opinion, the issues of whether the search was conducted properly under the terms of the statute and whether the videotaping constituted an unreasonable search and seizure were not properly before the trial court and are not properly before us here.

[3] Although all of the above parties have filed opposition to the petition for writ of mandate, National Broadcasting Company has since filed a notice of withdrawal as real party in interest and requested that we remove its name from the caption of this case. We therefore refer collectively to the remaining parties mentioned above as the media. Although the district attorney and counsel for both defendants appeared at the hearing on the petitions in superior court, these parties have not filed opposition to the petition for writ of mandate.

At the hearing in superior court on petitions of the media, counsel for Joseph Lyle Menendez acknowledged that he had had access to the videotapes of the execution of the search warrant for about a week. We infer from the transcript of the hearing that after the media filed their petitions for disclosure, the court permitted access to the videotapes by counsel for defendants for them to determine whether public disclosure of the videotapes would prejudice their rights to a fair trial in the criminal case. Although counsel for the defendants Menendez argued against release of the videotapes and other items sought in the petitions (including audio tapes of "911" calls relating to the deaths of Mr. and Mrs. Jose Menendez, and

media argued in their petitions that the videotapes of the execution of the search warrant should be disclosed because (1) they are "public records" under the California Public Records Act (Gov. Code, § 6250 et seq.); (2) they are documents or records of the court relating to a search warrant under Penal Code section 1534, which provides that if a search warrant has been executed, "the documents and records shall be open to the public as a judicial record"; and (3) disclosure is required under the First Amendment right to open criminal trials.

In written opposition to the petitions in superior court, Oziel argued that disclosure of the videotape would constitute an unauthorized "video-tour" of his home to which he has a right of privacy; that the videotaping exceeded the scope of the warrant; and that the media's proposed disclosure would constitute the tort of invasion of privacy by publicly disclosing private facts which would be offensive and objectionable to a reasonable person of ordinary sensibilities. Further, Oziel acknowledged that the legality of the making of the videotape had not yet been ascertained, and continued that "[a]ssuming the propriety and legality of both the search and videotaping thereof, (two propositions which Dr. Oziel does not here concede), 'the use of [that videotape] for another purpose [other than the one for which the government created it] or the disclosure of it to a third party' were specifically repudiated by the voters of California by enacting the privacy amendment to the California Constitution . . . ."

At the hearing on the petitions on May 22, 1990, Oziel argued that the magistrate authorizing the search warrant did not authorize a videotape, which "was done by the district attorney's office for their own purposes." As to the issue of whether the videotaping violated Oziel's Fourth Amendment rights, Oziel stated that "[w]e have not had the opportunity to argue it, and this doesn't appear to be the appropriate forum for doing that . . . . If we don't have a forum to have the material suppressed since we aren't a defendant here, what gave them the right to [videotape] if they can now turn it over?"

The court responded, "We know with a search warrant the police have the right to violate privacy. They have the right to go through there, search everything in the house where they might find items. That's what they have done. They have the right to go in and record it. [¶] In terms of reports, in

---

Bureau of Alcohol, Tobacco and Firearm documents related to the criminal case), we agree with the trial court's assessment that they did not make any argument that disclosure of the videotapes violated their rights to a fair trial. The issue of whether the disclosure of the videotapes of the execution of the search warrant prejudices the Menendezes' rights to a fair trial is not before us. Also not before us is the issue of a criminal defendant's right to discovery.

terms of personal recollections, they have the right to record it on audio, and I believe on video, and they are all public records." In response to Oziel's statement that under the court's ruling the police, in conducting a contraband search, could go in and videotape a strip search of the suspect, the court responded that the cases are viewed on a case-by-case basis, and "If there is something so egregious and embarrassing that overrides the public interests, I will step in. This is not such a case."

The minute order of May 22 states in pertinent part: "Motion for public disclosure of videotapes of the execution of the search warrant of the residence of Dr. Oziel related to the deaths of Mr. and Mrs. Jose Menendez is argued and granted as follows: The court orders the Beverly Hills Police Department to release to the public only the portions of the aforementioned videotape(s) excluding words and . . . excluding any physical evidence and any portions relating to any other patients."[4]

Oziel filed timely petition for writ of mandate and request for stay of that part of the May 22, 1990, order releasing the videotapes of the execution of the search warrant for Oziel's residence. We granted stay pending our further order, and issued order to show cause why respondent court should not be compelled to grant the relief requested in the petition. Hearing has been had thereon, and we conclude for the reasons set forth below, that the petition should be granted. Before addressing the principal issues raised by the petition, we first discuss the claims by real parties that the California Public Records Act applies herein, and that review by petition for writ of mandate is not available.

---

[4] At the hearing on the petitions, it was pointed out by one defense counsel, who had apparently viewed the videotapes, that at various points in the videotapes, files and ledger cards containing the names of Oziel's patients other than defendants Menendez, were held up and videotaped. The court stated that "I will not allow anything in that would in any way indicate the identity or references to other patients." The court then said, "I will go through the tape with someone and I will make the decision." The court also indicated that Oziel's attorney would be able to be present when the court went through the tape.

We find in our record no explanation of the court's ruling that the audio portion of the videotape was not to be disclosed, and no challenge is made to this aspect of the order. With respect to the distinction between recording of conversations of an informer with a defendant in the defendant's home, as opposed to videotaping of the encounter, one court has observed: "A voice is not essentially private in nature; we expose our voices to the general public every day in order to conduct our affairs. Thus, the distinction between transcribing a conversation and recording a conversation is of limited importance. [¶] . . . If the informer instead videotapes his encounter with the defendant, an additional element is added—an image of the interior of the defendant's home. Unlike a voice, this image is a reflection of that which is most private in our society; we do not expose our homes to the general public but only to select guests. Moreover, the image is likely to contain a richness of detail which could not be successfully communicated by even the most articulate of observers. One does not need a law degree in order to understand that a picture is worth a thousand words." (*Com.* v. *Kean* (1989) 382 Pa.Super. 587 [556 A.2d 374, 382].)

I

## Public Records Act

██ To the extent that the court ordered disclosure of the videotapes as public records subject to disclosure under Government Code section 6250 et seq., the court was in error. "The unambiguous language of the statute[5] speaks clearly on this point and it expressly exempts the state courts from the provisions of the Act. *Estate of Hearst* (1977) 67 Cal.App.3d 777, 782 [136 Cal.Rptr. 821] . . . correctly ruled that the Act does not apply to the judiciary." (*Pantos* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 258, 262 [198 Cal.Rptr. 489].) Without intending to imply that the videotapes herein constitute judicial records within the meaning of Code of Civil Procedure section 1904 or Penal Code section 1534, subdivision (a), we also note that it has been held that judicial records are exempt from the California Public Records Act. (*People* v. *Rhodes* (1989) 212 Cal.App.3d 541, 552 [261 Cal.Rptr. 1].)

Moreover, real parties, as did respondent court, improperly deem that the police or the district attorney had some claim to or right to possession of the videotapes.[6] However, an officer seizing and holding property under a

---

[5] Government Code section 6252, subdivision (d), provides in pertinent part that "public records" "includes any writing containing information relating to the conduct of the public's business prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics." Subdivision (a) defines "state agency" as "every state office, officer, department, division, bureau, board, and commission or other state body or agency, except those agencies provided for in Article IV (except Section 20 thereof) or Article VI of the California Constitution." Article VI deals with the judiciary."

[6] The trial court stated that because the search warrant authorized the entry into Oziel's home, thereby invading his privacy, the officers had the authority to record that invasion. The court intimated that the act of recording did not constitute any further invasion than the execution of the search warrant itself. The rationale seems to be that because the officers were entitled to view what they did in the execution of the warrant, the memorialization of what they did and saw in a videotape did not cause any further invasion of Oziel's privacy. While it may be true that the actual act of videotaping the execution of the search warrant did not cause any further invasion of Oziel's privacy than the search itself, the fact remains that the officers took away with them, as a product of the search warrant, videotaped images of the interior of Oziel's home. Thus, Oziel's concern may be not only the act of videotaping itself, but the images of the Oziel residence which were "seized" and memorialized on the videotape. Such images so memorialized were impliedly characterized by the trial court as property seized under a search warrant.

Although the return to the search warrant is not part of our record, and we do not know whether the videotapes are listed thereon, we would still reach the same conclusion because the videotapes were items taken under color of a warrant. The images thereon were "seized" while a search warrant was being executed and the warrant supplied the only authority for their seizure. (See *Hibbard* v. *City of Anaheim* (1984) 162 Cal.App.3d 270, 275, fn. 6 [208 Cal.Rptr. 733]; also see *People* v. *Matteo* (1985) 127 Misc.2d 112 [485 N.Y.S.2d 446, 447-448] [court ordered suppressed 10 photographs of interior of defendant's apartment taken by

search warrant does so on behalf of the court; possession by the officer is, in contemplation of the law, possession by the court. (*People* v. *Superior Court* (1972) 28 Cal.App.3d 600, 608 [104 Cal.Rptr. 876].)

█ Penal Code section 1536 provides that property seized under a search warrant "must be retained by the officer in his custody, subject to the order of the court to which he is required to return the proceedings before him, or of any other court in which the offense in respect to which the property or things taken is triable."

The same rule applies to property seized without a warrant: "But, [the People] argue, property seized without a warrant is not so held on behalf of the court and, thus, is not subject to an order made in a summary proceeding. █ We think the argument without merit. In the present case, it appears from the return that most (and possibly all) of the property involved was offered in evidence before the grand jury and is, therefore, presently in the possession of respondent court or its officers and agencies. [¶] But even as to property not yet offered or received in evidence we think that judicial control still exists. We are not now concerned with a private seizure, by a private individual, for some purpose of his own. We deal with property seized by a public officer, acting under the color of his status as a law enforcement officer, and seized solely on the theory that it constitutes a part of the evidence on which judicial action against its owner or possessor will be taken. We regard property so taken and so held as being as much held on behalf of the court in which the contemplated prosecution will be instituted as is property taken and held under a warrant. The seizing officer claims no right in or to the property, or in or to its possession, save and except as the court may find use for it. He must respond, as does any custodian, to the orders of the court for which he acted." (*Gershenhorn* v. *Superior Court* (1964) 227 Cal.App.2d 361, 366 [38 Cal.Rptr. 576].)

Accordingly, it is clear from our record that the police held the videotape on behalf of the court and have no authority to disclose it or dispose of it except as the court may order. Hence, the fact that the district attorney in the instant case may not have opposed media's petitions as to these videotapes is of no import and is irrelevant to the issue of whether the court properly ordered disclosure.

---

police executing search warrant for plastic container, not found therein; photographing was a seizure of intangible visual images of property as to which defendant had a reasonable expectation of privacy, and nothing in the affidavit to the warrant connected the property depicted in the photographs with the commission of a crime].)

While we agree with the trial court that the videotapes should be characterized as property purportedly seized under color of a search warrant, we do not reach the issue of whether that seizure was proper.

## II

### REVIEW BY PETITION FOR WRIT OF MANDATE

▪ CBS Inc. argues that the California Public Records Act (Gov. Code, § 6259, subd. (c)), *permits review of the instant order only by petition for writ of certiorari.* Our simple answer to this claim, as hereinabove stated, is that the California Public Records Act is inapplicable here because an item seized under color of a search warrant is held in the custody of the court, and the judiciary is not subject to the California Public Records Act.

The videotapes did not belong to the police, but were being held by them on behalf of the court as items seized under color of a search warrant. Accordingly, we deem the order permitting disclosure of the items herein to be in the same class as orders made after a nonstatutory motion for return of property seized either with or without a warrant. The denial of such motion is not reviewable by appeal, but by petition for writ of mandate. (*People* v. *Gershenhorn* (1964) 225 Cal.App.2d 122, 125-126 [37 Cal.Rptr. 176]; *Flack* v. *Municipal Court* (1967) 66 Cal.2d 981, 984-985 [59 Cal.Rptr. 872, 429 P.2d 192] [property seized without a warrant]; *Buker* v. *Superior Court* (1972) 25 Cal.App.3d 1085, 1090 [102 Cal.Rptr. 494] [property seized with a warrant].)

Furthermore, as a petition for writ of mandate is available in civil proceedings "in cases in which an order granting discovery violates a privilege [citation] or intrudes upon a constitutionally secured right to privacy" (*Reuter* v. *Superior Court* (1979) 93 Cal.App.3d 332, 336 [155 Cal.Rptr. 525], internal quotation marks omitted), we believe the present order, while not arising out of a civil discovery proceeding, is also appropriately reviewed by petition for writ of mandate because it similarly intrudes upon Oziel's constitutional right of privacy.

The foregoing convinces us that review of the order herein, which disposes of property seized under color of a warrant and which implicates a constitutional right of privacy, is appropriate by petition for writ of mandate.

## III

### PUBLIC RIGHT TO DISCLOSURE OF VIDEOTAPES

▪ The principal issue is whether the public, including the media, has any right to disclosure of the videotapes before they have been offered as an exhibit or admitted into evidence in any court proceeding, and before either Oziel, or Erik and Joseph Menendez, have been afforded a hearing on the

issues of the suppression or return of the videotapes or suppression of any items depicted thereon. The trial court permitted disclosure of portions of the videotapes which contained images not only of the interior of the Oziel home but apparently, also of files and/or tapes bearing the Menendezes' names.

Real parties have not cited any authority that *property* seized under color of a search warrant, as opposed to the affidavit, return or other documents and records of the court relating to the warrant, constitutes a judicial record. (See Pen. Code, § 1534, subd. (a), and Code Civ. Proc., § 1904, defining judicial record as "the record or official entry of the proceedings in a court of justice, or of the official act of a judicial officer, in an action or special proceeding.") Assuming arguendo that such property constitutes a judicial record, "the right of access [to judicial records] is not absolute. Nondisclosure may be appropriate 'for compelling countervailing reasons.' " (*People* v. *Rhodes* (1989) 212 Cal.App.3d 541, 550 [261 Cal.Rptr. 1], italics omitted.)

■ "Clearly, a court has inherent power to control its own records to protect rights of litigants before it, but 'where there is no contrary statute or countervailing public policy, the right to inspect public records must be freely allowed.' (*Craemer* [v. *Superior Court* (1968) 265 Cal.App.2d 216, 222 (71 Cal.Rptr. 193)].) The court in *Craemer* suggested that countervailing public policy might come into play as a result of events that tend to undermine individual security, personal liberty, or private property, or that injure the public or the public good." (*Estate of Hearst* (1977) 67 Cal.App.3d 777, 783 [136 Cal.Rptr. 821]; see also *Pantos* v. *City and County of San Francisco, supra*, 151 Cal.App.3d at p. 263 [judicial records are historically and presumptively open to the public and there is an important right of access which should not be closed except for compelling countervailing reasons].)[7]

■ The media herein argue that they have a First Amendment right of access to the videotapes, and "disclosure of the videotapes will allow the public to monitor the activities of police authorities in carrying out their duties." In order to resolve the merits of this claim, we apply the analytical framework set up in *Press-Enterprise Co.* v. *Superior Court* (1986) 478 U.S.

---

[7] The court in *Craemer* also intimated that the law in California does not follow the common law, which set out a more limited right of public access to judicial records: "The right of a citizen to inspect public writings has its origin in the common law. In *State* v. *McGrath* [(1937)] 104 Mont. 490 [67 P.2d 838, 841], the common law rule is stated thusly: 'At common law every person was entitled to the inspection, either personally or by his agent, of public records, including legislative, executive, and judicial records, provided he had an interest therein such as to enable him to maintain or defend an action for which the documents or records sought could furnish evidence or necessary information.' " (265 Cal.App.2d 216, 220, fn. 3.)

1 [92 L.Ed.2d 1, 106 S.Ct. 2735], which addressed the issue of the public's First Amendment right of pretrial access to the transcript of a preliminary hearing growing out of a criminal prosecution in California.

■ "In cases dealing with the claim of a First Amendment right of access to criminal proceedings, our decisions have emphasized two complementary considerations. First, because a ' "tradition of accessibility implies the favorable judgment of experience" ' [citations], we have considered whether the place and process have historically been open to the press and general public . . . . [¶] Second, in this setting the Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question. [Citation]. Although many governmental processes operate best under public scrutiny, it takes little imagination to recognize that there are some kinds of governmental operations that would be totally frustrated if conducted openly . . . . [¶] . . . If the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches. But even when a right of access attaches, it is not absolute. [Citation]. While open criminal proceedings give assurances of fairness to both the public and the accused, there are some limited circumstances in which the right of the accused to a fair trial might be undermined by publicity." (478 U.S. at pp. 8-9 [92 L.Ed.2d at pp. 9-11].)

The court in *Press-Enterprise Co.* acknowledged that the interests of those other than the accused may be implicated (478 U.S. at p. 9, fn. 2 [92 L.Ed.2d at p. 11]) but, in any case, the presumption of public access " 'may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.' " (*Id.*, at pp. 9-10 [92 L.Ed.2d at p. 11].)

■ We conclude that the media have not shown that disclosure of the videotapes would play a significant positive role in the functioning of the particular process in question, whether that process is viewed as the search warrant process or the pretrial hearing involving the disposition of items seized under color of a search warrant. Access to the videotapes is not necessary for the public to obtain knowledge about the execution of the search warrant and about the activities of authorities in regard thereto. Further, as was stated in *Gannett Co.* v. *DePasquale* (1979) 443 U.S. 368, 383 [61 L.Ed.2d 608, 624, 99 S.Ct. 2898], "In an adversary system of criminal justice, the public interest in the administration of justice is protected by the participants in the litigation." Moreover, there are "other mechanisms—including suppression motions and civil actions for violation

of constitutional rights—that are already in place to deter governmental abuses of the warrant process." (*Times Mirror Co.* v. *U.S.* (9th Cir. 1989) 873 F.2d 1210, 1218.) There is nothing to indicate that Oziel is incapable of vindicating, or unwilling to vindicate, the public interest in ensuring that law enforcement officials not conduct unreasonable searches and seizures. To the contrary, Oziel clearly proclaimed below that he challenged the videotapes as products of an unlawful search and seizure and intended to litigate that issue in an appropriate forum, although at the time the court ruled on the instant petitions, such a hearing had not been held.

As to the first criterion articulated in *Press-Enterprise Co.*, the media herein did not establish below, nor do they here, that the public has historically had pretrial access to items seized under color of a search warrant. "Under English common law, the public had no right to attend pretrial proceedings" (*Gannett Co.* v. *DePasquale, supra,* 443 U.S. 368, 389 [61 L.Ed.2d 608, 627]); and closed pretrial proceedings have been a familiar part of the judicial landscape in this country as well. (*Id.,* at p. 390 [61 L.Ed.2d at p. 628].)

Although the court in *Times Mirror Co.* v. *U.S., supra,* 873 F.2d 1210, was not presented with the issue of whether the public has a First Amendment right of access to warrant materials after an investigation is concluded or after indictments have been returned, it held that "the First Amendment does not establish a qualified right of access to search warrant proceedings and materials while a pre-indictment investigation is still ongoing. Our position is reinforced by still another factor, namely the privacy interests of the individuals identified in the warrants and supporting affidavits." (*Id.,* at p. 1216.)

The media have not brought to our attention any historical tradition in California of pretrial public access to items seized under a search warrant. Although not dealing with items seized under search warrants, we find two cases persuasive on the issue.

*Allegrezza* v. *Superior Court* (1975) 47 Cal.App.3d 948 [121 Cal.Rptr. 245], holds that the press and the public in general have no right to pretrial disclosure of a purported confession of a defendant awaiting trial for murder when the disclosure may deny the defendant a fair trial. (*Id.,* at p. 951.) In *Allegrezza*, the murder charge against defendant had received widespread county publicity in the media; defendant moved that an Evidence Code section 402, subdivision (b) hearing on the voluntariness of his confession be held in camera, which motion was denied by the court; on petition for writ of mandate, the trial court was found to have abused its discretion in denying defendant's motion: "Few things would more likely deny to him a

fair trial of those charges, than a pretrial public media announcement and elaboration of a confession which for good reason is later denied acceptance in evidence. Weighing the constitutional value here at stake, *'the most fundamental of all freedoms'* . . . , against the lesser and contrasting affront to the public right of informational access, we conclude that the superior court abused its discretion in its denial of an *in camera* hearing on the issue of the voluntariness of Allegrezza's purported confession." (47 Cal.App.3d at pp. 952-953, original italics.)

The court in *Allegrezza* continued, "The superior court was not obligated to strike a proper balance between the First Amendment right of freedom of the press, and the Fifth Amendment's guaranty of a fair trial. In the context of this case the rights of the press are no greater than the rights of the public generally. And the public generally has no right to pretrial disclosure of questionable evidence, a disclosure which might well deny to the accused the fair and impartial trial which is his due. (See *Craemer* v. *Superior Court*, 265 Cal.App.2d 216 . . . .)" (47 Cal.App.3d at p. 951.)

Following the reasoning in *Allegrezza*, the court in *Rosato* v. *Superior Court* (1975) 51 Cal.App.3d 190 [124 Cal.Rptr. 427] upheld a protective order and seal order of grand jury transcripts until completion of defendants' trials. In answer to the contention of petitioners therein, that "the orders were invalid because they [reporters] were not given notice of nor opportunity to be heard at the hearings at which the protective and seal orders were issued" (51 Cal.App.3d at p. 207), the court responded that "It is of crucial importance to keep clearly in mind that neither the press nor the petitioners were named in the protective or seal orders, that they were not subject to their terms, and that those orders did not purport to operate as a direct restraint on newspersons from publishing any information regarding the pending trial. Thus, the orders did not operate as a direct restraint on publication or free speech . . . ." (*Ibid.*)

Although not involving search warrants, and involving a different "overriding interest" than the right of privacy involved herein, the reasoning in both *Allegrezza* and *Rosato* is persuasive and equally applicable to the public policies at stake in the instant case.

██ ██ As the public policy of a state is found in its constitution, acts of the Legislature, and decisions of its courts (*Craemer* v. *Superior Court*, *supra*, 265 Cal.App.2d 216, 222), we find therein several countervailing policies which militate against public disclosure of the videotapes under the procedural posture of the instant case.

Penal Code section 1524, subdivision (d), states that "Any information obtained by the special master shall be confidential and shall not be

divulged except in direct response to inquiry by the court." Subdivision (e) of that statute provides in part that any police accompanying the special master "shall not participate in the search nor shall he or she examine any of the items being searched by the special master except upon agreement of the party upon whom the warrant has been served." The statutory provision for confidentiality suggests that, at least until the time that the items may be admitted into evidence, the videotape and the images recorded thereon are confidential and not subject to public disclosure. We thus interpret the phrase "documents and records of the court relating to the warrant" in Penal Code section 1534, subdivision (a), as *excluding* from its scope items seized pursuant to the warrant.

Moreover, setting aside the issue of whether the law enforcement officers acted legally in making the videotapes, it cannot be seriously disputed that public disclosure of the images thereon implicates Oziel's constitutional right of privacy and such right constitutes a legitimate governmental interest which the court has discretion to protect. (See, e.g., *Bullen* v. *Superior Court* (1988) 204 Cal.App.3d 22 [251 Cal.Rptr. 32] [widow of a murder victim sought and obtained a writ directing the trial court to vacate an order compelling her to submit to defense access to her home for discovery purposes].)[8]

■ Ordinary individual citizens enjoy certain protections, one of which is to be left alone in their own homes except under carefully prescribed circumstances. (*Miller* v. *National Broadcasting Co.* (1987) 187 Cal.App.3d 1463, 1490 [232 Cal.Rptr. 668, 69 A.L.R.4th 1027].) "As *Galella* v. *Onassis* [(S.D.N.Y. 1972)] 353 F.Supp. 196, observed, the individual's right to be let alone permeates the federal Constitution in a number of different ways. 'The Constitution itself creates a right of privacy. The First Amendment protects the right of freedom of association. The Fourth Amendment protects the individual from unreasonable searches and seizures. The Fifth Amendment and its privilege against self-incrimination safeguards the individual in a zone of privacy into which the Government may not intrude, and the Ninth Amendment provides that the enumeration in the Constitution of certain rights shall not be construed to deny or disparage others retained by the

---

[8]The court in *Bullen* stated: "In criminal cases, the trial court retains wide discretion to protect against the disclosure of information which might unduly hamper the prosecution or violate some other legitimate governmental interest . . . . [¶] In a proceeding seeking to compel the production of documents, [t]he protection of [a third party's] right to be free from unreasonable search and seizure constitutes a legitimate governmental interest. . . . [¶] Likewise, petitioner's fundamental right to privacy free from judicially mandated intrusion into her home invokes a legitimate governmental interest, rendering it incumbent on defendant to demonstrate sufficient plausible justification and good cause for the intrusion." (204 Cal.App.3d at p. 26, internal quotation marks omitted.)

people.' (*Id.*, at p. 231.)" (*Miller* v. *National Broadcasting Co.*, *supra*, 187 Cal.App.3d at p. 1490.)

"The right to privacy was added to the California Constitution by the voters in 1972. The ballot pamphlet, which was distributed to the voters prior to the election, stated that the constitutional right to privacy encompassed a variety of rights involving private choice in personal affairs. 'The right to privacy is the right to be left alone. It is a fundamental and compelling interest. It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communication, and our freedom to associate with the people we choose . . . . This right should be abridged only when there is compelling public need.'" (*Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 212 [211 Cal.Rptr. 398, 695 P.2d 695].) ■ The right of privacy guaranteed by article I, section 1 of the California Constitution protects against private as well as governmental conduct. (*Wilkinson* v. *Times Mirror Corp.* (1989) 215 Cal.App.3d 1034, 1040-1042 [264 Cal.Rptr. 194].) The state constitutional provision is principally directed at "(1) 'governmental snooping' and the secret gathering of personal information; (2) the overbroad collection and retention of unnecessary personal information by government and business interests; (3) the improper use of information properly obtained for a specific purpose, for example, the use of it for another purpose or the disclosure of it to some third party; and (4) the lack of a reasonable check on the accuracy of existing records." (*White* v. *Davis* (1975) 13 Cal.3d 757, 775 [120 Cal.Rptr. 94, 533 P.2d 222].)

The right of privacy guaranteed by the state Constitution has been held to encompass a plaintiff's right to be free from intrusion into her apartment by NBC, which was making a documentary on the work of paramedics, and followed paramedics into plaintiff's apartment and bedroom without plaintiff's knowledge or consent, filmed paramedics performing CPR on her dying husband and, without obtaining anyone's consent, aired the film on the evening news weeks later when plaintiff widow saw the film of her deceased husband. (*Miller* v. *National Broadcasting Co.*, *supra*, 187 Cal.App.3d at pp. 1476, 1489-1493.)

■ Although the media herein were not present for the execution of the search warrant for Oziel's home and did not commit a trespass, as did NBC in the *Miller* case, disclosure of the videotapes of such execution would be tantamount to permitting the media, as well as anyone viewing the videotapes, to accompany the special master in the search and seizure and would constitute a search and seizure itself, even though no actual trespass by the media and other viewers occurred. Such a "public" search and

seizure would constitute a violation of the provisions of Penal Code section 1524, subdivision (e).

Language in *Com. v. Kean, supra*, 556 A.2d 374, is pertinent.[9] Even though in *Kean* private individuals created the videotape of the defendants' sexual activities in the defendants' own bedroom, which videotape "would never have been created if not for an extraordinary invasion of the appellants' [defendants'] privacy" (556 A.2d at p. 378), a legitimate expectation of privacy attached to the videotape. The court explained: "The value of the videotape as a prosecution exhibit was that it embodied images of and information concerning what went on inside the appellants' residence and it was these images and this information that the appellants sought to keep private when they excluded the general public from their home. Moreover, the very nature of the videotape was such that a screening of the tape was a visual inspection of the home—a visual inspection which was at least as revealing as an actual entry into the home on the night of appellants' crime would have been. For purposes of the law of search and seizure, the videotape cannot be considered wholly apart from the place whose imprint it bears; *an examination of the videotape was a search of the home.* Since appellants had a constitutionally protected privacy interest in the home, we think it follows that this privacy interest could have been infringed upon when the police peered into the recesses of their home by means of playing the videotape." (556 A.2d at p. 383, original italics.)

The court in *Kean* further explained that the defendants' privacy interest in the videotape was not destroyed when it was viewed by a small number of private individuals before being viewed by the police: "We think it is clear that to stand naked before the eyes of another is not to stand naked before the entire world. To be forced to disrobe before a stranger is an invasion of privacy; to be forced to disrobe before a second stranger and a third stranger is a further invasion of privacy. To be spied upon by a Peeping Tom while in bed is an invasion of privacy; to be spied upon by a series of Peeping Toms and then by the police is a greater invasion of privacy. We conclude that each time the videotape in this case was examined, appellants' privacy was again compromised." (556 A.2d at p. 387.)

---

[9] The court in *Kean* noted that the facts presented a strange search and seizure issue which may be unique in the annals of the criminal justice system (556 A.2d at p. 375), as it involved the issue of whether defendants' rights under the federal and state constitutions were violated when the court refused to suppress a videotape showing them engaging in unlawful sexual activities in the bedroom of their home with two juveniles who, not acting at the behest of any governmental authorities, secretly videotaped the activities and turned the videotape over to the mother of one of them, who, in turn, gave the videotape to the police, who viewed it without a search warrant. Although the court found that the defendants had a protected privacy interest in their home and the images which had been secretly videotaped in their home, the subsequent warrantless viewing of the videotape by the police was justified as a valid third party consent search. (556 A.2d at p. 389.)

Here, it was the state which created the videotapes, rather than private individuals. Regardless of the legality of the making of the instant videotape, an issue we do not reach, it is clear from *Kean* that each separate examination of the videotapes of the execution of the search warrant would constitute a search of Oziel's home. It is one thing to be forced to submit to a search of one's home under color of warrant; it is quite another matter to be forced to have the whole world accompany the master during his search by watching a videotape showing everything the master did and saw during the search. Disclosure of the videotapes before Oziel has a hearing on the issue of the legality of the videotaping would render meaningless his right to raise this issue and move for a return of the images on the videotapes. Accordingly, public disclosure in this case implicates not only Oziel's privacy interests, but his Fourth Amendment rights. Given the privacy interests at stake and the procedural posture of the case,[10] we can only conclude that the trial court abused its discretion in permitting disclosure of the videotapes.

## IV

### LEGALITY OF THE VIDEOTAPING

■ Although Oziel adverted below to the issue of the legality of the videotaping of the execution of the search warrant, and does argue the issue in his petition for writ of mandate in connection with the right of privacy, it is clear to us, as contended by the media, that the issue was not properly before the trial court (even though the trial court did purport to rule on it), and is not properly before us for resolution.

We infer from our record that prior to the hearing on the order under review, Oziel had not had a hearing under Penal Code section 1524, subdivision (c), or pursuant to any other procedural vehicle, addressing the issue of whether the videotaping was unlawful or constituted an unreasonable

---

[10] We do not intend to imply that after pretrial motion or motions challenging the legality of the videotaping have been heard and if found to be lawful the media automatically have a right to disclosure of the videotapes. Even property legally seized under a search warrant may be delivered to the persons entitled thereto, upon good cause shown. (See, e.g., *Buker* v. *Superior Court, supra*, 25 Cal.App.3d at p. 1089.) As explained above, Oziel's right of privacy may preclude public disclosure even after the search and seizure issues have been resolved. Nor do we intend to imply that if the videotaping is found to be illegal, the only appropriate remedy would be a return of the images on the videotape to Oziel. The *return* to Oziel of the videotaped images, as opposed to their public disclosure, raises different issues; the parties, including the criminal defendants, have not yet had an opportunity to address these other issues, which are not before us.

All we decide here is that given Oziel's privacy interest and the procedural posture of the case, the trial court's order permitting disclosure of the videotapes was an abuse of discretion.

search and seizure. Oziel's counsel clearly indicated to the trial court, in both his written opposition to the petitions by the media and in oral argument, that Oziel was claiming the videotaping violated his Fourth Amendment rights, but he had not yet had the opportunity to argue the issue and he did not believe the hearing on the petitions of the media to be the "appropriate forum" for raising the issue. Accordingly, Oziel did not seek "return" of the allegedly improperly seized images on the videotapes, or any other remedy. The issue was not addressed by other parties. In the instant case "due process was choked off in midcourse" (*Williams* v. *Justice Court* (1964) 230 Cal.App.2d 87, 98 [40 Cal.Rptr. 724]) when the court, without notice to Oziel or anyone else, adjudicated the issue of the legality of the videotaping, then ordered the videotapes be disclosed.[11]

We conclude that review of the order herein by petition for writ of mandate is appropriate, the videotapes are not public records under the California Public Records Act, and that the court abused its discretion in permitting public disclosure of the videotapes.

Inasmuch as none of the parties submitted to the trial court the issue of the legality of the videotaping of the execution of the search warrant, the trial court should not have addressed the issue and made a determination thereon.

### DISPOSITION

Let a peremptory writ of mandate issue directing the respondent court to vacate that part of the order of May 22, 1990, permitting public disclosure

---

[11]Oziel's attorney commented that the videotaping "was done by the district attorney's office for their own purposes. Presumably those purposes had nothing to do with invading the privacy of the third party Dr. Oziel, but to protect themselves against subsequent lawsuits if things were damaged. Having to do with trying to have a record that the special master procedures were not abused." The court responded, "We don't know the reason that they taped it. You [Oziel's counsel] are speculating as to the reasons . . . . [¶] My gut reaction is they videotaped this to avoid those claims with regard to that case. Nonetheless, that's speculation, as you were speculating."

We fail to see how the trial court could have properly adjudicated the issue of the legality of the videotaping without a factual basis relating to the reasons for videotaping: " 'Putting to one side the procedural protections of the warrant requirement, the Fourth Amendment generally protects the "security" of "persons, houses, papers, and effects" against official intrusions up to the point where the community's need for evidence surmounts a specified standard, ordinarily "probable cause." Beyond this point, it is ordinarily justifiable for the community to demand that the individual give up some part of his interest in privacy and security to advance the community's vital interests in law enforcement; such a search is generally "reasonable" in the Amendment's terms.' " (*People* v. *Henderson* (1990) 220 Cal.App.3d 1632, 1650, fn. 7 [270 Cal.Rptr. 248].) It is unclear from our record how the instant videotaping advanced the community's interest in law enforcement.

of the videotapes of the execution of the search warrant of petitioner's residence.

Johnson, J., and Woods (Fred), J., concurred.